UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAY EDWARD BARRY,

                Petitioner,

v.                                    Case Number 16-13490
                                    Honorable David M. Lawson

RANDALL HAAS,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Nineteen-year-old Christopher Green was killed in Geneva Township, Michigan on December 9, 2002. The homicide remained unsolved for years. In 2011, the police renewed their efforts to solve the crime. The petitioner, Ray Edward Barry, ultimately was charged with open murder in Van Buren County, Michigan and convicted of first-degree, premeditated murder. After the petitioner's conviction was affirmed on appeal in state court, the petitioner filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254, raising six claims. In his response to the petition, the warden argues that the petitioner's claims are not cognizable on habeas review or are meritless and that the state appellate court's adjudication of the claims was not unreasonable. Because none of the petitioner's claims supports the issuance of a writ of habeas corpus by a federal court, the petition will be denied.

I.

The petitioner was tried in Van Buren County, Michigan circuit court. In its opinion on direct review, the state appellate court summarized the evidence at trial as follows:

On December 9, 2002, Chris [Green] left home on foot to take his friend Benny's dogs some venison. Chris was later found dead in a ditch. There were scuff marks, footprints, splattered blood, broken glass and hats found near Chris's body, which

indicated evidence of a struggle. Chris had suffered multiple stab wounds and blunt force trauma to the head. There was no DNA evidence or physical evidence directing police officers to the killer, although footwear impressions were taken. A new database allowed for search of similar tread and four of the five casts had similar tread to New Balance 601, 602, and 801, as well as Ascot Z Tech. In a statement to police in 2004, defendant said that he left out the back door of his home through the woods to another home. But then, in another version, defendant said he was curious about who was lying in the ditch, so he went and saw that it was Chris.

The day before the murder, Richard Martinez observed three young people in the street — a black man, a white man, and a white woman. He identified defendant as the black man he saw. The two men appeared to be ready to "square off" and the woman was walking away, apparently wanting nothing to do with it.

The [Floyd] Cousins family, the Green family, and the Barry family all lived on the same street. Chad Cousins (Chad) testified that he thought defendant "fancied" his sister Lisa. He would come over and talk to her and try and "hang out with her." He asked Lisa out on a date a few weeks before the murder. Chad testified that defendant came to the Cousins' home on the day of the murder. Defendant appeared to be nervous and fidgety.

Lisa [Cousins] testified that she met Chris six months prior to his death in the spring of 2002 and considered him one of her best friends. Their romantic relationship sort of "slowly fizzled" once Lisa went back to school in the fall of 2002. Lisa's family lived in a house they rented from the defendant's father. Defendant was friends with her father. She had no relationship with her father, who was abusive to her. Near the time of the murder, Lisa noticed a pair of tennis shoes in the box next to their wood stove. She found it odd that he would burn the shoes, as only wood and paper ever went into the stove. Floyd seemed paranoid when he was burning the shoes.

Two weeks prior to the murder, Chris told Randall Simmons (Randall) that Lisa's father had threatened to kill him if he went back to their house. But Chris also told Randall that Lisa's "boyfriend" threatened to beat him up. Randall thought that maybe Chris was referring to a black man that lived down the street (defendant), an individual whom Chris avoided.

Ashley Cousins (Ashley) saw defendant twice at Claude [Taylor's] apartment on the day of the murder. The first time she saw defendant he was dressed nicely and was wearing clean clothes and shoes. Several hours later Ashley saw defendant a second time. She explained: "He was dressed completely different. He had a different tone to him. He looked like something had upset him and he looked bothered, upset, disgruntled. He was dirty. I remember he was very muddy and very dirty and his shoes were like filthy. He didn't look anything like he had looked

earlier that day." Defendant talked quietly with Claude. Ashley "could tell something was wrong. I just didn't know what it was. You could tell something had upset him."

Claude testified that on the day of the murder, defendant came to Claude's apartment and said that someone had been murdered. Claude thought defendant's attitude was "odd." He seemed quiet and nervous. Defendant was not wearing his new shoes. Claude asked if defendant knew anything about the murder, but defendant said no. A few months later, Claude told defendant that the police "was kicking in my doors looking for me." That was when defendant told Claude "what happened" and how "he had got into it with" Chris. Claude testified: "I guess Christopher was looking through the window or something, I don't know, and then they got into it and that he had killed him." Claude told police about this conversation in 2003 and, in exchange, prosecutors did not pursue breaking and entering charges against him. He still went to prison for over a year for a probation violation.

Claude got out of prison only to get into trouble once again. He realized that the police had re-opened the investigation and Claude agreed to make contact with defendant and wore a wire when talking to defendant.

Jeanine [Black] testified that on the day of the murder, defendant came to the apartment she shared with Claude and "he just wasn't his self." He was pacing and it appeared that something was bothering him. Defendant was not wearing the new shoes Jeanine had bought for him — New Balance brand. Approximately a month after the murder, defendant told Jeanine that he had burned the shoes in a barrel behind the house because they had blood on them. Defendant said that somebody he did not know had been looking through the window and he grabbed a knife and went outside to "scare him off." Defendant admitted to stabbing the individual.

Antonio [Harris] testified that defendant called him and said "'Do you want to know something?'" and proceeded to tell Antonio that he beat up Chris, and got blood on his shoes.

John Reed (John) testified that in 2012, defendant "come out to the house and he was looking for Boddy and he said, well, do you know where the [defendant] lives, and I said, yeah. He said, well, will you take me up there so I can kill [him] because he said — he's been going around town saying that I raped Green and killed him — raped him before I killed him." Defendant told John that he did some "bad stuff" while John was in prison. Defendant told John that both he and Chris were dating Lisa. Defendant said that he and Boddy waited until Chris came near the trailer and then defendant "he beat him up."

*People v. Barry*, No. 321330, 2015 WL 4746250, at *14-15 (Mich. Ct. App. Aug. 11, 2015).

The petitioner did not testify. His defense was that the prosecution relied on incredible witnesses and that reasonable doubt existed because the prosecution was unable to prove its case when the crime occurred years earlier. Defense counsel also argued to the jury that the victim could have been killed in a car accident or assaulted by someone else, such as the men who discovered the victim's body or Lisa Cousins' abusive father, Floyd Cousins. The petitioner

> attempted to explain his damning statements [to witnesses] by implying that he was not only of low intellect, but suffered notions of grandeur. Licensed psychologist William Brooks testified that defendant had borderline intellectual functioning and "psychotic disorder not otherwise specified." Someone with the disorder would demonstrate thought disorder and delusional thinking. There may be severe and significant mood instability. Grandiosity, i.e., the need to be the center of attention is also a feature. An individual with delusions of grandeur wants to be "a part of the action, be a part of the center of the focus, be somebody important to the person that you want to impress." Someone with a low IQ might be gullible or easily manipulated.

*Id.*, 2015 WL 4746250, at *15. It was the prosecution's theory that the petitioner killed the victim because he had a love interest in Lisa Cousins and wanted to eliminate the victim, who was Lisa's boyfriend.

The trial court instructed the jury on first-degree, premeditated murder, second-degree murder, and voluntary manslaughter. On February 6, 2014, the jury found the petitioner guilty of first-degree murder, and on March 24, 2014, the trial court sentenced the petitioner to life in prison.

The petitioner filed a direct appeal, raising the same claims to the Michigan Court of Appeals as he asserts in his habeas petition. The Court of Appeals adjudicated the petitioner's claims on the merits and affirmed his conviction. *See Barry*, 2015 WL 4746250. The Michigan Supreme Court denied leave to appeal.

Barry filed his habeas corpus petition, alleging the following claims for relief:

I.     The district court abused its discretion in binding over to circuit court and the circuit court erred in refusing to quash the information.

II.   The trial court abused its discretion in denying the motion to quash the information and dismiss the charges with prejudice when it was discovered that clearly exculpatory evidence had been lost due to negligence of the police in mailing it to an independent laboratory for DNA testing. The trial court erroneously ruled that the evidence was not clearly exculpatory and due process requires that the conviction be vacated and the charges be dismissed. US Const Am XIV. Additionally, the trial court reversibly erred in failing to give an adverse inference instruction to the jury.

III.   The trial court abused its discretion in failing to admit evidence under MRE 404(b) that the putative third party assailant had choked his daughter with a wooden stick such that she suffered blunt force trauma when the forensic evidence was showed that the deceased suffered blunt force trauma, as well as stab wounds, and a tree branch was found over his body.

IV.   The trial court abused its discretion in admitting gruesome photos of the deceased victim.

V.   Petitioner was denied a fair trial and due process of the law, and the trial court abused its discretion in failing to order a mistrial, when the prosecution failed to disclose to the defense certain critical evidence—additional hairs—although the prosecution knew that the evidential value of the hairs taken from the crime scene were critical. This amounts to a Brady violation and prosecutor misconduct and the remedy is vacating the conviction and dismissal of the charges. Finally, trial counsel was ineffective in failing earlier to see that additional hairs remained which could have been tested, and to request testing of these hairs.

VI.   Petitioner's conviction must be vacated and the charges dismissed due to insufficiency of the evidence. US Const Am XIV.

Pet. at 7, 8, 9, 11, 12, 13.

The warden argues that some of the claims are not cognizable by a federal court under 28 U.S.C. § 2254, and the balance of the claims lack merit.

II.

Certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A

federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103, (2011). The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (quotation marks omitted)). The AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

## A.

The petitioner alleges first that the state district court abused its discretion in binding him over to circuit court for trial and that the circuit court erred by failing to dismiss the charges. The petitioner contends that there was no physical evidence or eyewitness testimony linking him to the

killing and that the bindover was based on unreliable statements which he allegedly made to Clyde Taylor and to Antonio Harris.

The Michigan Court of Appeals concluded that the district court did not abuse its discretion in binding over the petitioner for trial and that the trial court did not err in refusing to quash the charging document. The Court of Appeals also noted that, "[i]f a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover." *Barry*, 2015 WL 4746250, at *3 (quoting *People v.Wilson*, 469 Mich. 1018; 677 N.W.2d 29 (2004)).

No error resulted from that decision. The Constitution does not require a probable cause hearing to be conducted prior to a criminal trial. *See Gerstein v. Pugh*, 420 U.S. 103, 119, 125 n.26 (1975). An "illegal . . . detention does not void a subsequent conviction." *Id.* at 119. Therefore, a state court's decision to hold a person for trial does not implicate a federal constitutional right, especially when there is sufficient evidence of the crime presented at trial to satisfy the Due Process Clause. As the Supreme Court explained,

> due process of law is satisfied when one present in court is convicted of a crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

*Frisbie v. Collins*, 342 U.S. 519, 522 (1952).

The bind-over decision itself invokes a question of state law, which is not cognizable on habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Dorchy v. Jones*, 320 F. Supp. 2d 564, 578-79 (E.D. Mich. 2004) (denying habeas relief on petitioner's claim there was insufficient evidence to bind him over for trial).

The petitioner, therefore, is not entitled to relief on his claim.

B.

The petitioner alleges next that the trial court abused its discretion by not dismissing the charges after the parties discovered that hairs found on the deceased victim's hand were lost. The petitioner contends that the lost evidence was the result of police negligence in mailing the evidence to an independent laboratory for DNA testing. The petitioner asserts that the hairs had exculpatory value because he is an African American and a forensic scientist described the evidence as Caucasian hairs. The petitioner argues that, due to the loss of evidence, he was denied the possibility of showing that someone else was the murderer. He also contends that the trial court erred by failing to give an adverse-inference instruction to the jury. He wanted the court to to instruct the jury that, because the evidence was lost through no fault of his own, the jury could infer that the evidence, once analyzed, would have been favorable to him and unfavorable to the prosecution.

The petitioner raised this issue in the state trial court, which denied the petitioner's motion to dismiss the charges. The trial court determined that the hairs were not materially exculpatory evidence because no one knew what the results of tests on the hairs would be. The court stated that, if it turned out that the hairs belonged to the victim, the evidence would not benefit the petitioner. The trial court also determined that there was no bad faith on the part of the prosecution in losing the hairs and that it was simply a case of evidence being lost in the mail. The court ruled, however, that the jury could be informed that the attorneys had tried to have the evidence tested and that, through no fault of their own, the evidence was lost. Mot. Hr'g, ECF No. 8-10, PageID.583-88. And at the conclusion of the case, the trial court instructed the jurors that the court had ordered hair samples to be tested, but through no fault of the prosecutor or defense counsel, the items were lost in the mail. Trial Tr., ECF No. 8-22, PageID.2615.

The Michigan Court of Appeals also rejected the petitioner's claim, concluding as did the trial court, that the evidence was not exculpatory and that the petitioner had failed to show that the police or prosecution acted in bad faith to prevent the petitioner from having the evidence tested. The Court of Appeals also concluded that the petitioner was not entitled to an adverse-inference jury instruction because such an instruction was appropriate only when bad faith existed. *Barry*, 2015 WL 4746250, at *6-7.

The Supreme Court has held that defendants in a criminal prosecution are entitled to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). A prosecutor's suppression of material evidence favorable to the accused violates due process, regardless of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). But "the Due Process Clause [of the Fourteenth Amendment] requires a different result when [courts] deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood,* 488 U.S. 51, 57 (1988). "[U]nless a criminal defendant can show bad faith on the part of the [prosecution], failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*. at 58. To prevail on his claim, the petitioner

> must show: (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means. *Youngblood*, 488 U.S. at 57, 109 S. Ct. 333; *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996).

> "The presence or absence of bad faith by the [prosecution] for purposes of the Due Process Clause must necessarily turn on the [prosecution's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 57 n. *, 109 S.Ct. 333. It is not enough that the [prosecution] knew that [the evidence] could be determinative of guilt or innocence if preserved or

-9-

tested. . . .   When the government is negligent, or even grossly negligent, in failing to preserve potentially exculpatory evidence, bad faith is not established.

*Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002) (alterations added, end citations omitted).

The record in this case indicates that

[c]rime scene technicians removed Caucasian hairs from the victim's left hand. The Michigan State Crime Lab did not perform mitochondrial testing, so, at defense counsel's request, the trial court entered a consent order authorizing such testing up to $4,000 at Speckin Forensic Laboratory — a lab that was mutually agreeable to both defendant and the prosecutor.

*Barry*, 2015 WL 4746250, at *4.

The Michigan State Police Crime Lab sent the evidence to Speckin Labs by United States mail, and, as the prosecutor explained at the pretrial hearing, the mail carrier signed the receipt for the lab and left the evidence in Speckin Labs's mailbox.  Mot. Hr'g, ECF No. 8-10, PageID.577-78.  But no one knew what happened to the evidence after it was delivered to Speckin Labs.  *Id.* at PageID.579.  Employees at Speckin Labs searched their facility and could not find the evidence. Id. at PageID.577.  However, the scientist who was responsible for following the proper protocol did not have an organized method of storing evidence submitted to the laboratory.  *Ibid.*  Another explanation for the lost evidence was that a third party took the evidence out of Speckin Labs's mailbox, which had a flip lid that exposed items inside the mailbox.  *Id.* at PageID.536-38.

These facts indicate that the prosecution did not act in bad faith when it mailed the evidence to Speckin Labs.   It appears instead that someone not associated with the prosecution stole or misplaced the evidence after it was delivered to the laboratory.

Furthermore, although the evidence could not be obtained by other means, the petitioner has failed to prove that the hairs had exculpatory value.  The petitioner argues that the hairs would have demonstrated that someone other than him committed the crime because he is an African American and a forensic scientist for the State made a preliminary finding that the hairs were

characteristic of Caucasian hair. Trial Tr., ECF No. 8-21, PageID.2261, 2263-64, 2267. However, the hairs could have been the victim's own hairs or they could have come from any number of Caucasian individuals who inadvertently transferred strands of their hair to the petitioner before the incident with the petitioner. Furthermore, the jury was informed that the lost evidence, identified as L-29 and L-30, was Caucasian hair, *id*. at PageID.2458-2463, 2470, and defense counsel used the missing evidence to the petitioner's advantage by arguing to the jury that the prosecution did not want to test the evidence because it would not help their case. Trial Tr., ECF No. 8-22, PageID.2583-84.

The petitioner has failed to prove that the police acted in bad faith and deprived him of exculpatory evidence. Therefore, his claim of lost evidence is meritless, and the trial court was not required to read an adverse-inference jury instruction to the jury.

The petitioner is not entitled to relief on his claim.

## C.

The petitioner argues in his third claim that the trial court abused its discretion by refusing to admit evidence that Floyd Cousins choked his daughter Bobbie with a wooden stick. The petitioner argues that, because the murder victim suffered blunt force trauma and was found with a tree branch on his body, evidence that Floyd Cousins used blunt force on his daughter could have been used to show that Floyd was the murderer.

The trial court denied the petitioner's request to introduce the evidence as Floyd's modus operandi because there was insufficient evidence of a signature crime. The court noted that the previous incident involved a tool and choking, whereas the petitioner's case involved some blunt force trauma and a stabbing. The trial court also stated that any probative value in the evidence would be outweighed by confusion of the issues and unfair prejudice. Mot. Hr'g, ECF No. 8-14,

PageID.764-65. The Michigan Court of Appeals concluded that the trial court did not abuse its discretion by prohibiting the petitioner from introducing evidence of Floyd Cousins' abusive treatment of his daughter because the two offenses were distinct.

The petitioner raises this claim solely as a state evidentiary issue. As noted above, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 67–68.

Furthermore, although the Constitution "prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). A reviewing "court's duty 'is not to determine whether the exclusion of the evidence by the trial judge was correct or incorrect under state law, but rather whether such exclusion rendered [the] petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional rights.'" *Lewis v. Wilkinson*, 307 F.3d 413, 420 (6th Cir. 2002) (quoting *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)). It was not fundamentally unfair to exclude evidence of Floyd Cousins' use of a wooden stick to choke his daughter Bobbie because, as the Michigan Court of Appeals pointed out,

> [t]he two offenses were distinct. In the incident with Bobbie, Floyd allegedly choked her with a stick that the family used for its wood stove. There was no evidence that Floyd threatened Bobbie with a knife. In contrast, Chris suffered blunt force trauma to the face and head and had been stabbed repeatedly. Although a log was found near the body there was no DNA evidence found on the log showing that it was the instrument that was used to inflict the injuries. The only shared feature between the two acts was aggression. "It will not suffice that the 'like act' be simply another crime of the same general category or even of the same

specific character. . . . It is the uniqueness and the distinctiveness with which both crimes were committed, combined with the proof that the [actor] committed the 'like act', that is the key." The proposed other acts evidence in this case w[as] not "marked with special characteristics so uncommon, peculiar and distinctive as to lead compellingly to the conclusion that all were the handiwork of defendant because all bore his distinctive style or 'touch'."

*Barry*, 2015 WL 4746250, at *9 (citations omitted).

This holding did not contravene or unreasonably apply federal law. The petitioner is not entitled to relief in this claim.

### D.

The petitioner alleges that the trial court abused its discretion by allowing the prosecution to offer gruesome photographs of the deceased victim. The petitioner concedes that certain photographs of bloodless stab wounds on the victim's hands, scalp, and torso were relevant and not unduly inflammatory. He objects instead to a photograph showing the victim's bloody and battered body lying in or on a body bag and another photograph showing the victim's battered head and face. The petitioner maintains that the medical examiner's testimony sufficed to describe the extent of the victim's injuries and that the prejudicial effect of the disputed photographs outweighed any relevance they may have possessed.

The trial court ruled that the photographs were admissible because their probative value outweighed any danger of unfair prejudice and because there appeared to be no attempt to inflame the jury with the photographs. The trial court also noted that the intent to kill was an element of the offense and that the nature and extent of the injuries were relevant to the petitioner's intent.

The Michigan Court of Appeals rejected the petitioner's claim about the photograph of the victim's body because the photograph was not admitted in evidence and the jury never saw it. The court of appeals agreed with the trial court that the photograph of the victim's battered face was relevant and admissible to show that the petitioner possessed the intent to commit murder. The

court of appeals also noted that the photographs did not contain excessive gore and that the trial court had carefully considered the photographs before determining which ones were relevant and not substantially more prejudicial than probative. The court of appeals concluded that the trial court's decision to admit the photographs did not fall outside the principled range of outcomes. *Barry*, 2015 WL 4746250, at *9-10.

Once again, the petitioner raises his claim solely as a violation of state law. The Court may not grant the writ of habeas corpus on the basis of a perceived error of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Furthermore, the admission of gruesome photographs of the decedent is not a cognizable claim in a habeas corpus proceeding. *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997). Such claims do not "present a question of constitutional magnitude," *Pearl v. Cason*, 219 F. Supp. 2d 820, 830 (E.D. Mich. 2002), and the admission of gruesome photographs of a victim does "not deprive a criminal defendant of a fair trial," *Skrzycki v. Lafler*, 347 F. Supp. 2d 448, 455 (E.D. Mich. 2004). In short, "the admission of 'gruesome' photos of the decedent in a murder case does not justify collateral relief, even when the evidence is cumulative and likely designed more to inflame the jury than to supply an essential underpinning of the prosecution's case." *Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir. 1997) (citing *Gomez v. Ahitow*, 29 F.3d 1128, 1139-40 (7th Cir. 1994)).

The petitioner is not entitled to relief on his evidentiary claim.

### E.

The petitioner alleges that the prosecutor committed misconduct, and the trial court deprived him of due process by not ordering a mistrial, when the prosecution failed to disclose the existence of additional hairs, besides the lost ones, found on the deceased victim's body. The petitioner maintains that the evidence was exculpatory because, if the hairs came from a Caucasian

individual, they could have been used to show that he was not the murderer. The petitioner further alleges that his trial attorney was ineffective by failing to notice that additional hairs had not been tested and by failing to request that the hairs be tested.

Defense counsel raised this issue on the fourth day of trial, contending that he had discovered on the previous day that the police took additional hair fibers from the decedent's left hand. The trial court declined to grant a mistrial because there was no *Brady* violation or any violation of the Michigan court rule on discovery.

The Michigan Court of Appeals concluded on review of the petitioner's claim that the prosecution did not suppress evidence favorable to the defendant and that the trial court did not abuse its discretion when it denied the petitioner's motion for a mistrial. The court of appeals also determined that, although there was no sound trial strategy for failing to pursue testing of the fibers, the petitioner had failed to show that trial counsel's alleged error was prejudicial. *Barry*, 2015 WL 4746250 at #12-*13.

1.

By now, and even when the petitioner was charged with murder, "it is pellucidly clear that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Ray v. Bauman*, 326 F. Supp. 3d 445, 468 (E.D. Mich. 2018) (quoting *Wearry v. Cain*, --- U.S. ---, 136 S. Ct. 1002, 1006 (2016) (per curiam) (quoting *Brady*, 373 U.S. at 87)). There are three components to a true *Brady* claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Elmore v. Foltz*,

768 F.2d 773, 777 (6th Cir. 1985) ("To find a *Brady* violation, not only must the evidence be suppressed, we must also find that the suppressed evidence was material (in this case to the question of guilt) and that it was favorable to the accused.").

"[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The defendant

> "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." [*Wearry*, 136 S. Ct. at 1006] (quoting *Smith v. Cain*, 565 U.S. 73, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012)). "He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Ibid.*

*Ray*, 326 F. Supp. 3d at 468.

The petitioner has not established a true *Brady* claim because he has not shown that the prosecution suppressed the hairs in dispute. The prosecutor maintained at the hearing in state court that he provided notice of untested evidence in the discovery package, which he gave to defense counsel long before trial. The prosecutor also made the physical evidence available to defense counsel a few days before trial. Trial Tr., ECF No. 8-18, PageID.1651-1663; Trial Tr., ECF No. 8-21, PageID.2224-25.

Defense counsel admitted at the hearing that he had access to the evidence and that he may have been at fault for not opening the evidence envelopes. He stated that he simply had not been aware of an item that was only recently identified as "hair/fiber from the left hand of the decedent." Trial Tr., ECF No. 8-18, PageID.1646-49. In the habeas petition, moreover, the petitioner concedes that the prosecutor listed the disputed item at the outset of the case.

The petitioner, nevertheless, maintains that the prosecutor should have flagged the issue on his own. The prosecutor, however, had no duty to inform the defense of any evidence which might

conceivably have aided the defense in the preparation of its case. *Williams v. Wolff*, 473 F.2d 1049, 1054 (8th Cir. 1973).

Furthermore, the petitioner has not shown that the evidence was exculpatory. Defense counsel stated at the hearing in state court that he did not know what the evidence would show. Trial Tr., ECF No. 8-18, PageID.1647. Defense counsel also acknowledged the possibility that the evidence would prove to be irrelevant. *Id.* at PageID.1670. The petitioner contends that any hair evidence which did not come from an African American would have been exculpatory, but that is not necessarily true, as the Court pointed out above in its discussion on the lost hairs.

## 2.

The petitioner's claim that trial counsel was ineffective in his handling of the *Brady* claim is governed by *Strickland v. Washington,* 466 U.S. 668 (1984). *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). To establish a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both

deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) . . . . The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105.

The petitioner argues that defense counsel was ineffective by failing to realize sooner that additional untested hairs existed and by failing to ask to have the hairs tested. Defense counsel did request testing of the hairs when he made his argument at trial, Trial Tr., ECF No. 8-18, PageID.1647, 1670, and even if he was remiss by failing to notice the untested hairs sooner, the deficient performance did not prejudice the defense, because the evidence was not clearly exculpatory.

The state courts' rulings were neither contrary to nor unreasonable applications of *Brady* or *Strickland*. The petitioner, therefore, has no right to relief on his claim.

### F.

In his sixth and final claim the petitioner alleges that his conviction must be vacated and the charges dismissed due to insufficient evidence at trial. The petitioner points out that there was no physical evidence, such as fingerprints, footprints, hair, DNA, or a weapon, connecting him to

the crime. He further alleges that the two men who discovered the victim's body were untruthful about their whereabouts before discovering the body and that Claude Taylor's testimony about the petitioner's admissions was motivated by a self-serving deal that Taylor made with the police. Finally, the petitioner alleges that the only evidence against him was his statements, which were the product of a psychotic and delusional man. The Michigan Court of Appeals concluded on review of the petitioner's claim that there was sufficient evidence for a jury to conclude that the petitioner murdered the victim.

On habeas review, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "A defendant making such a challenge bears a very heavy burden, especially given that circumstantial evidence alone is sufficient to sustain a conviction and a jury may draw any reasonable inferences from direct, as well as circumstantial, proof." *United States v. Farrad*, 895 F.3d 859, 971 (6th Cir. 2018) (quotation marks and citations omitted).

The Court's "review of a state-court conviction for sufficiency of the evidence is very limited." *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018). "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*). First, it is the jury's responsibility to decide what conclusions should be drawn from the evidence admitted at trial. *Ibid*. "And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively

unreasonable." *Ibid.* (quotation marks and end citation omitted); *accord Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017); *Brown v. Konteh*, 567 F.3d 191, 204–05 (6th Cir. 2009).

In a habeas case, the *Jackson* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16. The petitioner was found guilty of first-degree premeditated murder. To establish this crime, "the prosecution must prove that the defendant intentionally killed the victim and [that] the act of killing was deliberate and premeditated." *People v. Haywood*, 209 Mich. App. 217, 229; 530 N.W.2d 497, 503 (1995).

The petitioner is not contesting the fact that the murder was deliberate and premeditated. Instead, he is challenging the jury's conclusion that he was the murderer. "Circumstantial evidence may support a conviction, *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), and such evidence need not remove every reasonable hypothesis except that of guilt. *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995)." *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006).

Further, the circumstantial evidence implicated the petitioner. Two weeks before the murder the victim informed Randall Simmons that Lisa Cousins' African American boyfriend had threatened to beat up the victim if the boyfriend saw the victim at Lisa's home. In addition, the victim did not like walking by the African American's residence.

On the day before the murder, Richard Martinez observed the petitioner arguing with the victim in Lisa Cousins' presence, and on the day of the murder, the petitioner looked upset and like something was bothering him. About a month later, he admitted to Jeanine Black that he had burned a pair of New Balance shoes because they had blood on them. A forensic scientist for the Michigan State Police testified that castings made from footprints at the crime scene could have been made by New Balance shoes. And Lisa Cousins testified that she saw Floyd Cousins, who

was her father and the petitioner's friend, burn a pair of newer tennis shoes in the family's wood stove after the murder.

The petitioner informed Ms. Black that he had chased and stabbed someone who was looking through his window. The petitioner informed both Antonio Harris and John Reed that he beat up the victim, and he admitted to Claude Taylor that he killed the victim.

Although the petitioner challenges the credibility of certain prosecution witnesses, "'attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.'" *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984)). An assessment of a witness's credibility generally is "beyond the scope of federal habeas review of sufficiency of evidence claims." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). A reviewing court does not redetermine the credibility of the witnesses whose demeanor has been observed by the factfinder. *Ibid*.

A rational trier of fact could have inferred from the evidence taken in the light most favorable to the prosecution that the petitioner caused Christopher Green's death by deliberately beating and stabbing him without justification. Therefore, the state appellate court's decision — that there was sufficient evidence for the jury to conclude that the petitioner murdered Green — was not contrary to, or an unreasonable application of, *Jackson*.

The petitioner is not entitled to relief on his challenge to the sufficiency of the evidence.

## III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not

established that he is presently in custody in violation of the Constitution or laws of the United

States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: July 11, 2019

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on July 11, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI